Daniel R. Price (NV Bar No. 13564)
Christopher Beckstrom (NV Bar No. 14031)
Janice J. Parker (NV Bar No. 14102)
Jasmin N. Stewart (NV Bar No. 16008)
PRICE & BECKSTROM
1404 S. Jones Blvd.
Las Vegas, Nevada 89146
Phone: (702) 941-0503
Fax: (702) 832-4026
info@pbnv.law

# UNITED STATE DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SUSAN RIKER,<br><br>Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY dba STATE FARM; ROE INSURANCE COMPANIES I-V dba STATE FARM;<br><br>Defendants. | Case No.: 2:23-cv-01572-ART-DJA<br><br>**AMENDED COMPLAINT** |

Plaintiff, SUSAN RIKER ("Susan"), by and through counsel of the law firm of PRICE & BECKSTROM, for her causes of action against the Defendants, and each of them, allege as follows:

1.     Susan was at all times relevant to this action a resident and citizen of Clark County, Nevada.

2.     State Farm Mutual Automobile Insurance Company ("State Farm") is and was a property and casualty insurer, licensed with the Nevada Division of Insurance, doing business in the State of Nevada, and was Plaintiff's auto insurance carrier at the time of the collision described herein.

3.     ROE INSURANCE COMPANIES I-V were insurance companies insuring the Plaintiffs at the time of the motor vehicle collision described herein, and were doing business as

State Farm. All allegations herein made against State Farm should also be construed as allegations against these fictitiously-named Defendants.

4.     At the present time, the true names and identities of Defendants ROE INSURANCE COMPANIES I-V are unknown to Plaintiff, who therefore sues such entities by fictitious names. When the true names, capacities, and identities of these parties named as ROES are discovered, Plaintiff will seek leave of court to amend this complaint appropriately. All allegations herein made against State Farm should also be construed as allegations against these fictitiously-named Defendants.

5.     Susan was a policyholder on a State Farm policy under policy number 150430128D (the "Policy").

6.     Susan and her late husband held the Policy and paid for uninsured and underinsured motorist coverage ("UIM").

7.     Nevada law requires an insurance company that provides UIM coverage to pay for all damages "which the insured is legally entitled to recover from the owner or operator of the other vehicle" to the extent those amounts exceed the other driver's liability policy limit, and subject to the UIM policy limit. NRS 687B.145.

8.     State Farm's UIM coverage was supposed to compensate Susan for all areas of damage another driver owed to Susan in the event Susan was injured in a car crash. This includes past medical bills, future medical bills, past pain and suffering, future pain and suffering, and any other areas of damage for which another driver could be liable to Susan under the law.

9.     The Policy had a fifty thousand dollar individual policy limit for UIM coverage.

10.     Susan and her late husband purchased this policy so that they could have peace of mind, knowing they would be compensated in the unfortunate event that one or both of them was injured in a crash by a driver who did not have enough insurance to pay for their injuries.

11.     As a long-time State Farm customer, Susan faithfully paid her insurance premium so that she would have this protection if she were injured in a car crash.

12.     Susan faithfully paid State Farm for many years because she trusted State Farm to help her access her insurance benefits if she were ever to get injured in a car crash.

13.     Susan faithfully paid State Farm for many years, expecting to never be injured in a car crash but all the while expecting that State Farm would compensate her for her pain and suffering, her medical special damages (or medical bills), and future medical care if she were ever to get injured in a car crash.

14.     Susan faithfully paid State Farm for many years, expecting that "like a good neighbor" State Farm would assist her in accessing all the benefits available to her under the Policy if she were ever to be injured in a car crash.

15.     Susan's expectations of State Farm were fair and reasonable, since State Farm owed Susan a fiduciary-like duty to consider her interests on the same level as her own interests, and to never place State Farm's interests above her own interests. *Allstate Ins. Co. v. Miller*, 125 Nev. 300, 311, 212 P.3d 318, 325 (2009).

16.     Susan faithfully paid State Farm for many years, expecting that State Farm would diligently investigate any claim made under the policy in order to promptly pay any benefits due to Susan if she were ever to be injured in a car crash.

17.     Susan's expectation that State Farm would diligently investigate and consider all evidence was reasonable, as the law states that an insurance company has a duty to investigate claims as part of its implied duty of good faith and fair dealing. *Physicians Ins. Co. of Wis., Inc. v. Williams*, 128 Nev. 324, 335 n.7, 279 P.3d 174, 181 (2012).

18.     Susan never imagined that if a day ever came for her to request benefits from State Farm, that State Farm would delay payment, place roadblocks and obstacles between Susan and her policy benefits, and place itself in a position that was adversarial to Susan's interests.

19.     Susan never imagined that if a day ever came for her to request benefits from State Farm, that State Farm would fail to adequately investigate Susan's claim, minimize evidence that favored the payment of benefits, and actively pursue evidence that State Farm hoped would result in a lower payment of benefits to Susan.

20.     On April 9, 2021, Susan was involved in a motor vehicle collision (the "Collision") as a passenger and was injured.

21.     The Policy was active at the time of the Collision, as Susan had faithfully paid her State Farm insurance premiums.

22.     Susan was a passenger in a 2010 Honda Civic vehicle belonging to her friend Kennath Strong. Kennath was the driver of the vehicle at the time of the Collision.

23.     The Collision occurred because an individual named Nancy George failed to pay attention and drove a 2007 Ford F-150 pickup truck into the rear-end of Kennath's Civic.

24.     The force from the collision was so significant that it pushed the Civic forward into a 1995 Chevrolet C-K 150 pickup truck.

25.     After the Collision, Nancy George got out of her car and said, "My dad is going to kill me."

26.     At the scene of the Collision, Nancy George told the other drivers that she was going to pull in to a nearby parking lot. However, this turned out to be a deception, as Nancy George fled from the scene instead.

27.     The police later found and interviewed Nancy George, who admitted that she drove into the rear end Kennath Strong's car at approximately 25 miles per hour.

— 4 —

28.     The collision caused significant bodily injury to Susan.

29.     Susan was transported by ambulance to an emergency room after the Collision.

30.     Susan informed State Farm of the collision and of the fact that she was injured by the collision.

31.     Susan hired an attorney to assist her with her insurance claim.

32.     Nancy George was insured for up to twenty-five thousand dollars per individual for bodily injury liability.

33.     Therefore, State Farm was responsible for paying Susan UIM benefits for all damages Nancy Geerge owed to Susan over the amount of twenty-five thousand dollars, subject to the fifty-thousand-dollar UIM policy limit.

34.     Susan's damages exceeded twenty-five thousand dollars; therefore, Nancy George was underinsured.

35.     Susan made a claim with State Farm for UIM benefits under her policy.

36.     After being informed of the Collision, State Farm took little to no action to investigate the claim, taking the general attitude that if State Farm owes Susan any money, Susan and her attorney would need to affirmatively produce all evidence in support of that, and that State Farm would only affirmatively investigate aspects of the claim that State Farm hoped would likely result in lower payment to Susan.

37.     Some years prior to the Collision, Susan had back problems that required her to undergo spine surgeries.

38.     Dr. Kaplan is a Harvard-trained neurosurgeon who had provided medical treatment to Susan for a long time before the Collision.

39.     Dr. Kaplan did a spine surgery on Susan in July of 2019, before the Collision.

40.     Susan was doing much better after the 2019 back surgery. Dr. Kaplan noted, only two days after the lumbar spine surgery, that Susan was walking with minimal assistance and that the pain she had before the surgery was gone.

41.     When Susan saw Dr. Kaplan in August of 2019, after her surgery, she still had some back pain, but the pain was much better than it had been before the surgery.

42.     Despite this improvement, Susan's back was still fragile. She was approximately 70 years old after her surgery and had a history of back problems and surgeries.

43.     Because Susan's back was so fragile, a simple event such as a fall at home could and did at times cause her pain to increase.

44.     Even though her back problems were real and persistent, they had improved to the point that she did not even go in for treatment at Dr. Kaplan's office from March of 2020 until April of 2021, when she was involved in the Collision.

45.     When Susan saw Dr. Kaplan after the Collision, Dr. Kaplan reported that Susan was experiencing new neck and back pain.

46.     Susan had also had shoulder problems before the Collision, and after the Collision her orthopedic doctor was concerned that the Collision progressed Susan's preexisting rotator cuff tear further.

47.     In May of 2021, Susan was taken to the emergency room because the pain in her back was so bad that she was found lying on the floor of her bedroom and unable to move.

48.     A low back MRI showed a large disc herniation at L3-4. Dr. Kaplan discussed doing a new back surgery.

49.     Dr. Kaplan referred Susan to DiMuro Pain Management, a pain management specialist, get an epidural injection in her low back before doing a surgery.

— 6 —

50.     Susan saw DiMuro Pain Management in June of 2021. On July 15, 2021, Susan underwent the epidural steroid injection recommended by Dr. Kaplan. The procedure was performed by Dr. John DiMuro, the pain management specialist. Susan had pain relief for about three days from the innjection, but then the discomfort started coming back.

51.     Because the epidural injection did not give Susan significant relief, she went back to see Dr. Kaplan who recommended that Susan do a spinal cord stimulator trial as an alternative to surgery. If successful, the spinal cord stimulator would provide Susan significant pain relief without having to do another serious lumbar spine surgery. Susan was happy with the option presented to her. The spinal cord stimulator trial procedure would be done by DiMuro Pain Management.

52.     Susan went back to DiMuro Pain Management to discuss doing the spinal cord stimulator trial. The pain management specialist indicated that the total bill for the spinal cord stimulator trial would be $57,980.00, but that if Susan's health insurance would not cover the procedure, the doctor's office would work with Susan to have a cash-pay arrangement.

53.     This was reasonable for Susan to consider since she had already undergone an interventional procedure with Dr. DiMuro's office and had developed a relationship of trust with that provider.

54.     This was reasonable for Susan to consider because if the spinal cord stimulator was successful, Dr. Kaplan would do the permanent spinal cord stimulator implant, and Dr. Kaplan would be able to take Susan's insurance.

55.     Susan then asked State Farm to pay benefits under the UIM policy. Susan planned to use this money to pay cash for the spinal cord stimulator trial.

56.     Accordingly, on December 22, 2021, Susan sent a request for payment of policy benefits to State Farm. At the time of that request for benefits, Susan had already incurred $21,714.00 in medical bills for her treatment for the crash that she had been able to identify. Susan

also informed State Farm of the need for the spinal cord stimulator trial which Dr. DiMuro estimated to cost $57,980.00. Susan asked for a response to her request within one month of the date of her letter.

57.     State Farm responded to Susan's request on January 17, 2022, and stated, "We received your time limit demand for UIM benefits, which expires on January 21, 2022. In response to your demand and based upon the documentation in our file, our offer is $0."

58.     State Farm went on to state, "In order for us to reconsider our position, please send the repair estimate and photographs for our insured's vehicle as well as additional documentation to support the claimed medical specials amount and future treatment."

59.     Susan was surprised by this response, as the Civic involved in the Collision did not even belong to her. Susan was surprised and disappointed that State Farm had not done any independent investigation into the Collision to obtain these documents in the nine months that had passed since the Collision.

60.     State Farm indicated that it needed Susan or Susan's attorney to obtain Nancy George's insurance documents to prove how much insurance coverage Nancy George had. This showed that State Farm had not reached out to Nancy George's insurance company or done any independent investigation of the claim. State Farm apparently had not reached out to Kennath Strong to ask about the Collision or obtain evidence in his possession in the nine months that had passed since the collision.

61.     State Farm indicated that it needed prior medical records from Dr. Kaplan, but did not request for Susan to sign a HIPAA authorization for State Farm to obtain documents, nor did State Farm make any independent effort to obtain the information it stated it needed to evaluate Susan's claim.

62.     State Farm indicated it needed Susan to provide an estimate of future treatment that "names and describes the future procedure," even though Susan had already provided Dr. Kaplan's recommendation for the procedure and Dr. DiMuro's estimated cost of the procedure.

63.     State Farm did not indicate that it was taking any independent action toward investigating and obtaining the evidence it needed to pay Susan's claim.

64.     Because State Farm did not pay the UIM benefits Susan asked for, Susan was unable to move forward with the spinal cord stimulator trial recommended by Dr. Kaplan.

65.     State Farm did not reach out to Kennath Strong or his insurance company to ask for information about the Collision.

66.     State Farm did not reach out to Nancy George or her insurance company to ask for information about the Collision.

67.     Susan did not have photographs or repair estimates in her possession.

68.     Susan sent another letter to State Farm on April 4, 2022, itemizing the past medical expenses and pointing to Dr. Kaplan's note recommending the spinal cord stimulator trial that had already been provided to State Farm.

69.     For almost two full months, State Farm did not respond, and on June 1, 2022, State Farm indicated it would not take further action on the claim unless Susan provided the additional requested documents. State Farm did not indicate that it had made any independent effort to investigate or obtain information about the claim.

70.     It took Susan and her attorney some time to gather the requested documents, and on August 17, 2022, Susan sent State Farm the declarations page from Nancy George's auto policy, the damage estimate from Kennath Strong's vehicle, and prior treatment records from Dr. Kaplan's office. Susan's letter also explained that Susan's attorney had contacted Dr. DiMuro's office to ask if they had additional information to show State Farm, and that provider indicated that the name of the

1    procedure (2-lead spinal cord stimulator lead placement and spinal cord stimulator programming)

2    was indicated on the cost estimate previously provided to State Farm.

3        71.    Susan's letter from August 17, 2022, also asked State Farm to issue UIM benefits to

4    Susan in order to assist Susan in being able to afford the spinal cord stimulator trial.

5        72.    State Farm did not respond for 42 days. On September 28, 2022, State Farm stated in

6    a letter that Susan's file was forwarded to management for further review. Even though Susan had

7    already indicated in her previous letter that she needed the UIM benefits to help her afford the spinal

8    cord stimulator trial with the doctor of her choice, State Farm inquired about whether Susan had

9    undergone the procedure yet.

10       73.    Susan responded with a letter that same day and indicated that she was expecting to

11   use the proceeds from her UIM benefits to help pay for the spinal cord stimulator trial, and that the

12   delay in payment had delayed her treatment.

13       74.    On October 4, 2022, State Farm sent Susan a letter explaining that it would like to

14   proceed with an medical examination in order to evaluate her claim. State Farm indicated that

15   "Exam Works" would be contacting her.

16       75.    Susan understood that under her insurance contract, State Farm had the right to

17   choose a doctor to examine Susan and provide opinions to State Farm. Susan wanted to cooperate

18   with State Farm's request.

19       76.    State Farm's contractual right to a medical examination of a doctor of its choosing is

20   subject to State Farm's duty of good faith and fair dealing.

21       77.    It would be inappropriate in light of the fiduciary-like duties State Farm owed to

22   Susan for State Farm to select a doctor it knew or should have known would be biased and likely

23   render opinions that would be designed to artificially reduce Susan's policy benefits.

24

Price & Beckstrom
Attorneys At Law

78.     State Farm owed Susan a duty to use a well-qualified physician who would give valid and impartial opinions about Susan's injuries.

79.     Therefore, Susan sent a letter to State Farm on October 12, 2022, asking if State Farm would consider using Dr. Kaplan for the medical examination. Susan provided the following reasons why Dr. Kaplan would be a good choice to give opinions to State Farm:

- Dr. Kaplan has treated Susan both long before and following the Collision and thus knows her history and symptoms better than any other physician;

- He is a well-credentialed, Harvard-trained neurosurgeon;

- He has not treated Susan using an attorney lien and has no reason to be biased in the outcome of this claim; and

- Susan has an established doctor-patient relationship with Dr. Kaplan ensuring Dr. Kaplan's honesty in whatever opinion he renders as to the cause of Susan's symptoms and treatment.

80.     The letter went on to say, "If State Farm believes that Exam Works will provide a physician who is better-situated than Dr. Kaplan to supply a reliable medical opinion, kindly respond in writing to this letter [to] explain why this is the case."

81.     State Farm ignored Susan's suggestion that it consider Dr. Kaplan for State Farm's medical examination. After receiving no response for over two months, Susan sent a letter to State Farm on December 7, 2022, asking State Farm to please respond to her request.

82.     State Farm finally responded to Susan's letter on December 19, 2022. In its response, it quoted a provision from the Policy contract that states, "A person making a claim under . . . [UIM] Coverage . . . must be examined as reasonably often as we may require by physicians chosen and paid by us."

83.     The State Farm adjuster's December 19, 2022, letter stated Dr. Kaplan could not be considered because he "has a known prior doctor-patient relationship with Ms. Riker. . . ."

84.     The policy provision cited by the State Farm adjuster did not support the statement that Dr. Kaplan was ineligible to perform the examination because he already has a doctor-patient relationship with Susan. That requirement asserted by the adjuster is not found anywhere in the Policy contract.

85.     State Farm did not provide any substantive response to Susan's list of reasons why Dr. Kaplan would have been an appropriate physician to examine Susan and to provide opinions to State Farm.

86.     State Farm did not provide any reason why a physician from Exam Works was more qualified or better-situated than Dr. Kaplan to perform the examination and provide opinions to State Farm.

87.     State Farm insisted on using a physician from Exam Works because those physicians regularly provide medical causation opinions to insurance companies that are favorable to the insurance company and unfavorable to the injured claimant.

88.     Rather than upholding its fiduciary-like duty to consider Susan's interest on the same level as its own interest, State Farm selected a group of physicians that it expected to provide opinions that were unfavorable to Susan because it put State Farm's interests above Susan's. State Farm sought to obtain a medical opinion to support its goal to pay a reduced amount of benefits to Susan.

89.     State Farm has used Exam Works in other cases and is aware that this group regularly provides opinions to insurance companies. Insurance companies, including State Farm, regularly retain the services of Exam Works because they use those physicians as biased expert witnesses to try to reduce the amount of money paid out in claims.

90.     Even though the Policy did not require State Farm to hire a physician that had no doctor-patient relationship with Susan, State Farm wanted to hire a physician from Exam works

*specifically because* the Exam Works physician had no doctor-patient relationship with Susan. The doctor from Exam Works would therefore owe Susan no duties under the doctor-patient relationship and would not risk being liable for medical malpractice and would provide biased opinions adverse to Susan's interest.

91.    State Farm knew that reliance on a biased physician examination would violate duties it owed to Susan as her insurer, including the implied duty of good faith and fair dealing, but State Farm was concerned only with justifying a "lowball" offer to Susan under her UIM coverage.

92.

93.    State Farm breached its duties to Susan when it provided no substantive reason why an Exam Works doctor would provide more reliable opinions than Dr. Kaplan.

94.    Susan nevertheless cooperated with State Farm's request and agreed to submit to an examination with an Exam works doctor.

95.    On February 3, 2023, Susan submitted to State Farm's medical examination with Exam Works physician James S. Forage, M.D.

96.    State Farm knew that Dr. Forage is regularly hired by insurance companies and defendants in lawsuits and regularly provides biased opinions downplaying the severity of a claimant's injury.

97.    State Farm selected Dr. Forage through because it knew he was likely to provide an opinion that would be unfavorable to Susan and could assist State Farm in justifying a "lowball" offer to Susan under her UIM coverage.

98.    The selection of Exam Works and Dr. Forage to do State Farm's evaluation was not consistent with State Farm's duty to conduct a fair and unbiased investigation of the claim.

99.    In light of State Farm's fiduciary-like duties to Susan, including the implied duty of good faith and fair dealing, it was inappropriate for State Farm to treat Susan like an adverse party.

State Farm should not have been seeking to build a defense case against Susan as if Susan was an adverse party.

100.   State Farm should have been conducting an unbiased investigation of the facts, considering the likely outcome of a lawsuit against Nancy George, a hit-and-run driver who caused a serious collision and injuring Susan, who was a fragile and vulnerable individual with a history of spine problems.

101.   Instead, State Farm treated Susan like she was an adverse party and used a doctor that would typically be used as a defendant's hired expert in the defense of an adversarial personal injury lawsuit.

102.   After Susan submitted to the examination of Dr. Forage on February 3, 2023, State Farm still provided no response to Susan's request for payment of UIM benefits.

103.   Susan originally requested payment of her UIM benefits in December of 2021, expecting to use that money to pay cash for a spinal cord stimulator trial with a doctor she trusted and with whom she had established a relationship.

104.   Despite Susan's compliance with all of State Farm's requests, in March of 2023, State Farm had still not paid any UIM benefits to Susan.

105.   Dr. Forage authored a 16-page opinion dated February 19, 2023, but State Farm did not respond to Susan's claim for benefits or provide a copy of the opinion to Susan.

106.   On March 21, 2023, Susan sent another letter to State Farm asking for a response. Because the two-year statute of limitations on her claim against Nancy George was approaching, Susan filed a lawsuit against Nancy George and provided a copy of that lawsuit to State Farm.

107.   State Farm did not immediately respond to Susan's letter dated March 21, 2023. Instead, State Farm sent additional questions to Dr. Forage, and State Farm received a supplemental opinion from Dr. Forage on April 2, 2023.

108.    State Farm finally sent Susan a copy of both of Dr. Forage's reports on April 10, 2023, but did not offer any response to Susan's request for payment of UIM benefits.

109.    As expected, Dr. Forage provided many biased opinions designed to reduce the benefits State Farm owed to Susan. For example, Dr. Forage stated that Susan "did not sustain a traumatic injury to either the cervical spine or the lumbar spine" as a result of the Collision. Dr. Forage also gave the opinion that any increase in pain Susan had would have been healed with a six-week course with a chiropractor or physical therapist. State Farm knows that these are very common opinions given by Exam Works doctors to downplay the severity of a car crash injury.

110.    Weeks later, State Farm finally responded to Susan's claim for UIM benefits on May 2, 2023, stating, "Based upon the enclosed . . . report from Dr. Forage, we are in a position to offer a settlement in the amount of $8000."

111.    State Farm's letter indicated that in making this offer, it was relying only on the opinion of Dr. Forage in making Susan an offer of $8,000.00.

112.    Prior to making this offer, State Farm never asked to speak with Susan to ask her how the injury affected her or caused her to suffer. State Farm did not ask Susan about the ways her life had changed since the Collision. State Farm did not ask to take a statement from Susan or consider Susan's experience with the injury in evaluating her claim. State Farm did not ask or attempt to speak with any of Susan's treating providers for their opinions about Susan's treatment or injuries. State Farm instead relied only on the opinion of its own hired doctor to determine the amount of Susan's pain and suffering. State Farm made this decision without making a fair effort to gather all of the evidence.

113.    Aside from compelling Susan to submit to an examination with Exam Works physician Dr. Forage, State Farm did not take any affirmative steps to gather evidence or conduct an unbiased investigation of the claim.

114.    State Farm did not take all of the evidence into account in evaluating Susan's UIM claim but chose to rely only on the biased opinion of Exam Works and Dr. Forage and ignoring the rest of the evidence. State Farm's plan all along was not to gather all of the evidence to make an unbiased claim decision; State Farm's plan was to gather and consider only enough evidence to justify making a "lowball" offer to Susan.

115.    State Farm did not pay or offer to pay the $8,000.00 it offered to Susan as an undisputed benefit.

116.    In offering Susan $8,000.00, State Farm was inviting Susan to negotiate her claim, further treating her as an adverse party to State Farm. State Farm offered Susan less than what it believed was the fair value of Susan's claim. This was not in keeping with State Farm's fiduciary-like duties it owed to Susan.

117.    As part of its duties to Susan, and as part of its duty to conduct an unbiased investigation of the claim, State Farm had a duty to monitor the lawsuit against Nancy George and to stay up-to-date on the evidence of damages that Nancy George owed to Susan.

118.    State Farm knew that Susan had filed a lawsuit against Nancy George.

119.    State Farm knew that the amounts Susan was legally entitled to recover against Nancy George would determine the value of the UIM claim.

120.    After offering Susan $8,000.00, State Farm took no affirmative action toward investigating the claim or keeping up-to-date on the lawsuit against Nancy George.

121.    Because Susan could not afford to pay cash for the spinal cord stimulator procedure with Dr. DiMuro without the UIM funds, Susan had to find a different pain management doctor who would accept her insurance. Susan was disappointed about being unable to use the doctor of her choice but could not live with the pain any longer. Susan did the spinal cord stimulator trial which provided her significant pain relief. However, following the spinal cord stimulator trial she had a

serious infection and was hospitalized. Due to her infection, for the time being Susan is unable to receive the permanent spinal cord stimulator implant from Dr. Kaplan and has to continue to live with the pain.

122. On July 12, 2023, Susan's case against Nancy George was heard in a damages prove-up hearing in front of Nevada State District Court Judge Eric Johnson.

123. Judge Johnson considered Susan's live testimony, medical documentation, and the traffic crash report and awarded Susan $253,479.17 in damages against Nancy George.

124. Judge Johnson entered judgment against Nancy George on July 19, 2023.

125. Because State Farm was not taking any active effort to investigate the claim, it did not promptly pay Susan the benefits she was due under her UIM coverage, which were ultimately determined by the outcome of the lawsuit against Nancy George.

126. Susan filed the instant lawsuit against State Farm on August 22, 2023, and served process on State Farm on September 6, 2023.

127. Even after being served with a lawsuit which included information about the judgment against Nancy George, State Farm still did not promptly pay UIM benefits due to Susan.

128. On October 16, 2023, Susan sent another request to State Farm for payment of UIM benefits.

129. State Farm finally agreed to pay Susan the $50,000.00 due to Susan under her UIM contract on October 23, 2023.

130. State Farm's conduct as described herein gives rise to all of the claims for relief set forth below. Although these claims for relief are set forth separately below, they should be read in conjunction with all of the other allegations contained in this pleading, as if each paragraph of this Complaint were set forth in support of each claim for relief.

**FIRST CLAIM FOR RELIEF**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

131.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs herein, and incorporates the same herein by reference.

132.    The implied covenant of good faith and fair dealing underlies every contract.

133.    Under Nevada law, insurance carriers have heightened duties under the implied covenant of good faith and fair dealing due to the position of trust they hold over their insureds.

134.    State Farm is an insurance carrier subject to these heightened duties.

135.    On the date of the subject collision, Susan was a State Farm policyholder that included a UIM policy with a fifty thousand dollar individual coverage limit.

136.    State Farm failed to keep and uphold the implied covenant of good faith and fair dealing.

137.    State Farm's conduct, when taken in its entirety, as set forth above and incorporated herein, constitutes a breach of the covenant of good faith and fair dealing.

138.    The implied covenant of good faith and fair dealing includes the duty to conduct a fair, prompt, and unbiased investigation of claims. State Farm breached the implied covenant of good faith and fair dealing when it took little to no affirmative steps to obtain information relevant to the claim, unless that information was likely to assist State Farm in forming a pretext to justify a "lowball" offer to Susan. State Farm further breached this duty when it repeatedly failed to promptly respond to Susan's requests and instead delayed the claims process unnecessarily. State Farm failed to monitor the lawsuit against Nancy George in order to pay benefits owed to Susan. Even after learning of Susan's judgment against Nancy George, State Farm *still* delayed payment of UIM benefits.

139.    State Farm earns interest and dividends on unpaid claims and benefits financially from delaying the payment of policy benefits to its insureds. State Farm has benefitted financially

from its delay in paying the fair value of Susan's UIM claim. State Farm's benefit from delaying payment on Susan's claim is at odds with the fiduciary-like duties owed to Susan.

140.    The implied covenant of good faith and fair dealing requires State Farm to uphold its fiduciary-like duties to consider Susan's interests on at least the same level as it considers its own interests. State Farm breached the implied covenant of good faith and fair dealing when it selected a physician to conduct an examination of Susan who State Farm expected would provide biased medical opinions in accordance with that physician's regular practice as a retained medical causation expert for defendants. State Farm expected that Dr. Forage and Exam works would provide an opinion that would be disfavorable to Susan's claim. State Farm then chose to rely on this opinion and ignore or downplay the evidence that favored Susan's claim.

141.    Because State Farm enjoyed a special relationship of trust with Susan, owing her fiduciary-like duties under the law, State Farm's breach of the implied covenant of good faith and fair dealing as described in the instant pleading was tortious in nature, with State Farm in a superior entrusted position and being engaged in grievous and perfidious conduct with respect to the rights of Susan.

142.    All of the above allegations in this Amended Complaint, incorporated herein, evidence and support Susan's claim that State Farm beached the implied covenant of good faith and fair dealing and caused Susan harm as a proximate result of the breach.

143.    Susan is entitled to an award of compensatory damages against State Farm in an amount to be determined by the trier of fact, but in any event in excess of fifteen thousand dollars.

144.    The conduct described in this pleading and incorporated herein was done with conscious disregard to Susan's rights with knowledge of the probable harmful consequences that were likely to result to Susan.

145.    Based upon State Farm's conduct in this matter, an award of punitive or exemplary damages is also appropriate to make an example of State Farm and to convince State Farm and others not to behave as State Farm has behaved.

**SECOND CLAIM FOR RELIEF**
**(Statutory Violations of NRS 686A.310)**

146.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs herein, and incorporate the same herein by reference.

147.    State Farm violated NRS 686A.310 in at least the following ways: failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies; failing to acknowledge and act reasonably promptly upon communications with respect to claims; and failing to effectuate a prompt, fair and equitable settlement of Susan's claim even though State Farm's liability had become reasonably clear.

148.    These statutory breaches are demonstrated throughout the course of conduct set forth above including, but not limited to, the following particulars:

- The failure to promptly respond to requests for information;

- The failure to take sufficient affirmative steps to investigate the claim, gather documents, interview witnesses, and obtain other relevant evidence;

- The failure to monitor the lawsuit against Nancy George, the results of which would determine with finality the amounts owed under Susan's UIM policy coverage;

- The failure to promptly pay undisputed benefits.

149.    Based upon the above, Plaintiff is entitled to recover compensatory damages in an amount to be determined by a trier of fact, but in any event in excess of fifteen thousand dollars.

150.    Based upon State Farm's conduct in this matter, an award of punitive or exemplary damages is also appropriate to make an example of State Farm and to convince State Farm and others not to behave as State Farm has behaved.

### **PRAYER**

WHEREFORE, Plaintiff, SUSAN RIKER, expressly reserving her right to amend this Complaint at the time of trial to include all items of damage not yet ascertained, demands judgment against Defendants, jointly and severally, and for Plaintiff as follows:

1. General damages which include those for hardship, stress, mental distress, betrayal, humiliation, and suffering in an amount in excess of fifteen thousand dollars, to be set forth and proven at the time of trial;

2. Attorney fees;

3. Costs of suit incurred;

4. Exemplary or punitive damages to be set forth and proven at the time of trial,

5. Pre- and post-judgment interest, and;

6. Such other relief as to the Court seems just and proper.

Dated this 31st day of October, 2023.

*/s/ Christopher Beckstrom*
Christopher Beckstrom (NV Bar No. 14031)
PRICE & BECKSTROM
1404 S. Jones Blvd.
Las Vegas, Nevada 89146

## **CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of PRICE & BECKSTROM, and on the date indicated below I served the foregoing ***Amended Complaint*** upon the following via the CM/ECF system:

James E. Harper, Esq.
Law Office of Harper Selim
1935 Village Center Circle
Las Vegas, NV 89134
*Attorney for Defendant*

DATED this 31st day of October, 2023.

 */s/ Christopher Beckstrom*
An employee of PRICE & BECKSTROM



Price & Beckstrom
Attorneys At Law